# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# TALLAHASSEE DIVISION

AUGUSTA SANDINO CHRISTIAN
NAMPHY, DREAM DEFENDERS,
NEW FLORIDA MAJORITY,
ORGANIZE FLORIDA, and FLORIDA
IMMIGRANT COALITION,

      Plaintiffs,

      v.                             Case No. 4:20-cv-00485-MW

RON DESANTIS, in his official capacity
as Florida Governor, and LAUREL M. LEE,
in her official capacity as Florida Secretary
of State,

      Defendants.
_____/

## THE STATE'S RESPONSE IN OPPOSITION
## TO THE PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

### BACKGROUND

If voting is the beating heart of democracy, as this Court has said, then any changes to the voting process should be carefully considered and made with a steady hand; each strand of muscle and sinew must be accounted for in the final analysis. And here, it is the Plaintiffs' burden to make such an accounting. They fail to do so.

Director Matthews's declaration provides the relevant background concerning the voter registration system and its role in Florida's election system:

1

The online voter registration system supplements the various other ways that a potential elector can register to vote in Florida. An applicant can register: by submitting an application by mail or in person to their Supervisor of Elections; through the Department of Highway Safety and Motor Vehicles when applying for, renewing, or updating a driver license or identification card; through a voter registration agency when applying for, renewing, or updating services or assistance from that agency; through each qualifying educational institution, which provides the opportunity to register at least once a year; or through the Fish and Wildlife Conservation Commission when applying for, renewing, or updating licenses with that agency.

Federal law permits Florida to choose a "book closing" date (deadline for registration) up to 30 days prior to election day. Florida has chosen to set its book closing date 29 days prior to election day. Book closing for the 2020 General Election was October 5, 2020. About 26 states have book closing between 20 and 30 days prior to election day. The book closing dates vary based on things like the particular state's number of electors and potential electors, early voting dates, and capability to process applications.

Supervisors of Elections need time between book closing and the election to finalize their list of registered electors before voting starts. In Florida, there were 13,891,370 voters registered as of book closing for the 2020 Primary Election. Any new registrations must be completed prior to the start of voting, which in Florida, can be as early as 15 days before Election Day. It is my understanding that 49 of the 67 Supervisors will begin early voting on October 19.

Voter registration applications need to be processed in the order received. It is not unusual for multiple applications to be received from various sources for the same applicant. Applicants do not necessarily remember that they already

submitted an application when they bought a fishing license, or submitted an application to a third party voter registration organization at the farmer's market, or otherwise, prior to submitting another application through the online voter registration system. Each of these applications have to be processed.

Florida law gives Supervisors of Elections 13 days to enter applications. This contemplates a last minute crush of applications, which is typical. No matter when the deadline is, people tend to wait until the last minute. Florida's book closing on October 5, allows Supervisors to enter all applications received by that deadline the day before early voting starts on October 19 and notify the voter of their status (by sending a registration card). Voters must be notified of their status within 5 days of registration entered into the system. This all ensures that voters do not show up to vote before they are actually registered and on the voter rolls. People would otherwise lose faith in the system. Some voters may already experience this because of the extension of book closing to October 6. Further extension will just exacerbate that problem. Even with electronic poll books, the registration list must be finalized and loaded onto the book days prior to making its way to the early voting or polling place location.

If a voter's application has not yet been processed by the time they show up to vote, they must vote a provisional ballot that will be counted once their registration can be confirmed. This adds time at the polling place which, even prior to the COVID-19 pandemic was less than ideal.

ECF 23-1.

**ARGUMENT**

## I.   THE PLAINTIFFS HAVE NO STANDING.

As the Eleventh Circuit recently reiterated, the Plaintiffs must establish "(1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision" to invoke federal jurisdiction. *Jacobson v. Fla. Sec'y of State*, 957 F.3d 1193, 1201 (11th Cir. 2020) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). Neither the Mr. Namphy nor the Organizational Plaintiffs can satisfy this "irreducible constitutional minimum." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (quoting *Lujan*, 504 U.S. at 560). For that reason alone, they are not entitled to a preliminary injunction and their complaint should be dismissed.

### A.   MR. NAMPHY.

Contrary to his affidavit, it appears that Mr. Namphy has been a registered Florida voter for almost three years. According to Amber Marconnet, the Assistant Director of the Division of Elections for the Florida Department of State, "Augusta Sandino Christian Namphy became a registered voter on November 1, 2017, and submitted record updates on October 8, 2018, and September 20, 2019, respectively." ECF 23-2. He was "issued voter identification cards on November 2, 2017, October 15, 2018, and October 5, 2019." *Id*. Critically, "Augusta Sandino Christian Namphy remains a registered voter as of today." *Id*.

The same is true of declarant Kyle Redula. *Id*. He "became a pre-registered voter (available to 16 and 17-year old registrants) on April 20, 2016." *Id.* He "became an active registered voter in January of 2018." *Id*. He "was issued a voter identification card as recently as July 21, 2020, and previously on January 25, 2018." *Id*. And critically, "Kyle Redula completed an Online Voter Registration update on October 6, 2020, at 2:57 p.m. changing his party affiliation," and he "remains a registered voter as of today." *Id*.

For that reason, there is no individual in this case who has the constitutionally required injury-in-fact to maintain this lawsuit, and the only individuals referenced have received all the relief requested in the complaint. Without an injury to redress, there can be no Article III standing.

## B.   THE ORGANIZATIONAL PLAINTIFFS

Although "an organization has standing to sue when a defendant's illegal acts impair the organization's ability to engage in its own projects by forcing the organization to divert resources in response," *Arcia v. Sec'y of Fla*., 772 F.3d 1335, 1341 (11th Cir. 2014), none of the Organizational Plaintiffs have satisfied this test.

"'[T]o support or oppose a motion for a preliminary injunction,' a party must present '[e]vidence that goes beyond the unverified allegations of the pleadings and motion papers." *Interface, Inc. v. J&J Indus*., No. 4:13-cv-47-WSD, 2013 U.S. Dist. LEXIS 158609, at *7 (N.D. Ga. Nov. 5, 2013) (quoting Charles Alan Wright et al.,

Federal Practice and Procedure § 2949, at 237 (3d ed. 2013)). And although "a district court may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction," it may only do so "if the evidence is 'appropriate given the character and objectives of the injunctive proceeding.'" *Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.*, 51 F.3d 982, 985 (11th Cir. 1995) (quoting *Asseo v. Pan Am. Grain Co.*, 805 F.2d 23, 26 (1st Cir.1986)). In other words, the plaintiff's evidence must bear some indicia of reliability." *Interface, Inc.*, 2013 U.S. Dist. LEXIS 158609, at *7.[1] In contrast, "[b]are pleadings and attorney argument . . . are not evidence and do not satisfy the plaintiff's burden." *Id.* (citations omitted).

The declarations Plaintiffs offer wholly fail to establish that any of the organizations, or their members, have suffered any cognizable injury, "irreparable" or otherwise. Across the board, the declarations fail to establish that any eligible Florida voter was unable to register before the extended deadline. Instead, they recite online reports, phone calls, messages from colleagues or investigations indicating problems with Florida's online voter registration website on October 5, and then end with conclusory and speculative allegations of a need for more time to advise

---

[1] *See also Qualls v. Rumsfeld*, 357 F. Supp. 2d 274, 281 (D.D.C. 2005) ("When moving the court for a preliminary injunction, plaintiffs bear the burdens of production and persuasion. To meet these burdens, [plaintiffs] may rely on evidence that is less complete than in a trial on the merits; however, the evidence [plaintiffs] offer must be credible evidence." (internal citations and quotation marks omitted)).

hypothetical prospective registrants of the extended deadline. *See* ECF 3-2 (Declaration of Nialah Summers); ECF 3-3 (Declaration of Andrea Mercado); ECF 3-4 (Declaration of Stephanie Porta); ECF 3-5 (Declaration of Maria Rodriquez).

The only other declarations submitted by Plaintiffs are those of their counsel and two out-of-state lawyers for a non-party advocacy group, all of whom simply regurgitate information from online reports, twitter posts, texts, and investigations indicating problems with the OVR site on October 5. None ever acknowledge the extension of the registration deadline. *See* ECF 3-9 (Declaration of Adam Lioz); ECF 6-1 (Declaration of Blair Bowie); and ECF 9-2 (Declaration of Hayden Johnson). None of this purported evidence establishes irreparable harm.

In other words, the Plaintiffs are wrong when they assert that "[t]he State has not extended the OVR deadline to compensate for the lost time, essentially denying the right to vote to thousands of Floridians, including the Individual Plaintiff and Organizational Plaintiffs' members and constituents." ECF 3, at p. 26. The earliest that any of Plaintiffs' declarants allege problems with the OVR site on October 5, 2020, was "approximately 2:00 to 3:00 p.m." ECF 9-1, at ¶4 (Declaration of Redula).[2] Thus, even if accepted as true, and construed in the light most favorable to

---

[2] *Cf.*, ECF 15-1(Declarant Namphy: "We started trying to register around 8:30 p.m."); ECF 3-2, ¶8 (Declarant Summers: "At or around 6 p.m. . . . ."); ECF 3-3, ¶11 (Declarant Mercado: "on or around 5:45 or 6:00 p.m."); ECF 3-4, ¶ 14 (Declarant Porta: "At approximately 5 p.m. . . . ."); ECF 3-5 (Declarant Rodriguez: "on or about October 5, 2020, the OVR site went down from 3:30 pm to 6:00 pm and then

Plaintiffs, the Plaintiffs' evidence suggests that the purported issues with the online voter registration site lasted no more than ten hours; yet, it is undisputed that the Secretary extended the registration deadline for nineteen hours (until 7 p.m., on October 7, 2020), and took pains (along with Governor DeSantis, Vice President Joe Biden, and numerous other individuals and entities, including the Plaintiffs' counsel in this case) to ensure that any eligible individual who experienced difficulty registering had notice of the extension. *See* ECF 22.

Simply put, after realizing the emergent situation, the State took immediate action to ensure that all eligible voters would have the chance to use the online voter registration website to register to vote. It worked feverously to address the technological issues, it extended the deadline in a way commensurate with the time of the difficulty, and it did everything in its power to ensure that Floridians were put on notice of the extension. And these efforts appear to have succeeded; the Plaintiffs offer no evidence of any issue whatsoever with the online voter registration site during the extended period. *The Plaintiffs cannot point to a single person who could not register during the extension already provided.* For this reason, the Organizational Plaintiffs cannot maintain standing under either an associational or an organizational theory. And for that reason, the claims fail.

---

again, from 8:15 pm to 9:37 pm."); ECF 3-9, at ¶2 ("On the evening of October 5, 2020 . . . ."); ECF 9-2, ¶4 (Declarant Johnson: "On October 5, 2020, starting at approximately 5:00 p.m. . . . .").

## II.  THE *PURCELL* DOCTRINE BARS THIS CASE FROM PROCEEDING

At its core, the *Purcell* Doctrine exists to prevent judicially created voter confusion when regulations are challenged close to an election. Specifically, and according to the Supreme Court, "orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls." *Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006). Naturally, "[a]s an election draws closer, that risk will increase." *Id.* at 5.

The Presidential Election has already begun. Across the State, County Supervisors of Elections have enlisted platoons of individuals to ensure that, during a year presenting challenges unlike any previously experienced, Floridians will have the opportunity to cast their ballots safely and effectively. For that reason, neither Leon County Supervisor Mark Earley nor Okaloosa County Supervisor Paul Lux believe that the voter registration deadline should be extended a second time. The former has averred that he is "concerned that another extension of the voter registration deadline will confuse voters and thereby undermine confidence in the election," especially since "[t]his extension would come after a gap where registration was closed." ECF 23-3. "Based on [his] experience in elections administration," Supervisor Earley further averred that "another extension under the circumstance will confuse voters," which will "result in misinformation after the length and reasons for the extension," especially since "there is already a substantial

amount of misinformation about the November General Election." *Id.* Supervisor Lux stated bluntly that he "oppose any further extension of the voter registration deadline," given the immense amount of work that he and his staff much accomplish in the precious little time left before the Election. ECF 23-4.

Director Matthews similarly warns that "[t]o extend the deadline (again) would divert resources from what [the supervisors] should now be focused on—processing vote-by-mail requests (which must be turned around in 2 days) and vote-by-mail ballots, followed by additionally setting up and administering early voting, and other election administration activities." ECF. 23-1.

This case fits within the heartland of the *Purcell* Doctrine. Given the steps the State has taken to account for the technical difficulties experienced by those trying to register on October 5, and the havoc that would ensue if the Court were to re-extend the once-extended deadline, the Court should deny the Plaintiffs' request for a preliminary injunction.

## III.   GOVERNOR DESANTIS IS NOT A PROPER PARTY.

The Governor is not a proper party to this litigation and thus this action against him should be dismissed. The Governor has not waived his sovereign immunity guaranteed under the Eleventh Amendment, and the Plaintiffs fail to plead any exception. *See, e.g.*, *Ex Parte Young*, 209 U.S. 123, 168 (1908). The Governor's "general executive power" is "not a basis for jurisdiction in most circumstances."

*Women's Emergency Network v. Bush*, 323 F.3d 937, 949-50 (11th Cir. 2003); *Harris v. Bush*, 106.F. Supp. 2d 1272, 1276-77 (N.D. Fla. 2000). Rather, where courts have permitted narrow *Ex Parte Young* exceptions to state sovereign immunity, it is when state officers are directly "responsible for" a challenged action and have a "connection" to the unconstitutional act at issue. *Luckey v. Harris*, 860 F.2d 1012, 1015-16 (11th Cir. 1988); *see also Support Working Animals, Inc. et al. v. DeSantis*, 2020 WL 1991479 (N.D. Fla. Apr. 27, 2020) (dismissing the Governor where he has no direct role in implementing a challenged state law).

As this Court has already determined, the Governor is not a proper party in election-registration disputes because his "office [does] not 'connect[] him with the duty of enforc[ing]' a voter registration extension[.]" *Florida Democratic Party v. Scott*, 215 F.Supp.3d 1250, 1255 (N.D. Fla. Oct. 10, 2016) (quoting *Ex Parte Young*, 209 U.S. at 161). Here, Florida Statutes do not charge the Governor with the direct responsibility for implementing election laws or the state's online registration system. Therefore, he is not a proper party and should be dismissed.

## IV.   THE PLAINTIFFS ARE NOT ENTITLED TO A PRELIMINARY INJUNCTION.

The Eleventh Circuit has long held that "[a] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establishe[s] the 'burden of persuasion'" as to each of the four familiar prerequisites. *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998) (quoting *All*

*Care Nursing Service, Inc. v. Bethesda Mem'l Hosp., Inc.*, 887 F.2d 1535, 1537 (11th Cir. 1989)). To prevail, then, the Plaintiffs must show that (1) they have "a substantial likelihood of success on the merits"; (2) they will suffer "irreparable injury . . . unless the injunction issues"; (3) "the threatened injury . . . outweighs whatever damage the proposed injunction may cause the" Defendants; and (4) "if issued, the injunction would not be adverse to the public interest." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc). They have failed to do so.

## A.   THE PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS OF THEIR *ANDERSON-BURDICK* CLAIM.

The *Anderson-Burdick* test asks the Court to "weigh 'the character and magnitude of the asserted injury to the rights . . . that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,'" considering "'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)). The Supreme Court has long defined "the right to vote" as "the right to participate in an electoral process that is *necessarily structured* to *maintain integrity* of the democratic system." *Anderson*, 460 U.S. at 788 (emphases added).

This clarification is crucial. "Common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections." *Burdick*, 504 U.S. at 433. In recognition of this point, the Supreme Court

has also long held that "there must be a *substantial* regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Storer v. Brown*, 415 U.S. 724, 730 (1974) (emphasis added). "[T]he State's important regulatory interests are generally sufficient to justify" voting restrictions, *Anderson*, 460 U.S. at 788, so long as they are on the whole "reasonable" and "nondiscriminatory," *Burdick*, 504 U.S. at 434.

"[E]lection laws," moreover, "'invariably impose some burden upon individual voters,'" *New Ga. Project v. Raffensperger*, No. 20-13360-D, 2020 U.S. App. LEXIS 31405, at *5 (11th Cir. Oct. 2, 2020) (quoting *Burdick*, 504 U.S. at 433), and Florida's online voter registration deadline is no exception. "That means strict scrutiny is not required for every voting regulation," and the Court should not apply that standard here. *See id*. "[T]o say otherwise would 'tie the hands of States' as they seek 'order, rather than chaos' in their elections." *Id*. (quoting *Burdick*, 504 U.S. at 433).

And here, the burden is not as dire as the Plaintiffs would have it, especially in light of the extension provided by the Secretary of State. As noted above, the Secretary extended the deadline once already, this extended deadline allowed the only individuals referenced in this litigation to register, and the Plaintiffs have shown this Court nothing to suggest that the extension failed to fully alleviate the purported burden on anyone's right to vote.

In contrast, the State's interest in leaving intact the extended online voter registration deadline is compelling (even though its interest need not rise to that level). As the Eleventh Circuit recently underscored, election-related deadlines animate numerous interests, such as "conducting an efficient election" and "maintaining order." *New Ga. Project*, 2020 U.S. App. LEXIS 31405, at *9. Both interests would suffer tremendously if the Court extended the voter registration deadline beyond the extension the State already provided.

According to Leon County Supervisor of Elections Mark Earley:

> I am concerned that another extension of the voter registration deadline will confuse voters and thereby further undermine confidence in the election.  This would be the second extension of the registration deadline.  This extension would come after a gap where registration was closed.  Based on my experience in elections administration and talking to average voters day to day, another extension under the circumstances will serve to reinforce the confusion and mistrust voters have surrounding this election, further strengthening the rampant misinformation and disinformation campaigns that are already undermining the November General Election.

> Based on my experience, I also expect any extension of the registration deadline to add to the call volume at my office. My staff and I have already been inundated with telephone calls at a rate that far exceeds any past election cycle because of the misinformation endemic to this election cycle. I cannot add more staff - we are busting at the seams already while trying to maintain some semblance of social distancing working under these incredible stress levels.

Finally, as detailed in the letter provided by the President of the Florida Supervisors of Elections association, of which I am the Vice President, the Secretary's extension of the voter registration deadline because of technical issues on October 5, 2020 was an appropriate extension. We received 313 new registrations through the online system on October 5, 2020. We received 295 new registrations through the online system on October 6, 2020; 56 people either registered for the first time or changed their registration information in person on October 6, 2020. These numbers are consistent with new registrations at the end of registration in past elections. If the argument being made is that the extension needed more publicity to be effective, I disagree.

ECF 23-3. And according to Okaloosa County Supervisor of Elections Paul Lux:

My staff and I are in the midst of the General Election. We have innumerable tasks that require us to put in long hours. Among other things, we are mailing ballots, receiving completed ballots, and counting ballots; we are planning for the start of early voting on October 19, 2020; we are answering voter inquiries, and there have been many this election cycle; we are training poll workers; and we are inputting voter registration form that we have received (and will continue to accept voter registration forms that arrive as late as October 11, 2020 consistent with existing Florida law).

Moving the voter registration deadline yet again will impose additional responsibilities on my staff and me. My staff and I would have to process additional registration materials and upload it onto our electronic poll books within 13 days of whenever the new deadline ends; provide voter registration cards to the new registrants; and reconcile our voter rolls with the State's voter rolls at some point beyond the current October 12, 2020 deadline. Any additional extension will almost certainly result in added call volume; current call volume has already exceeded expectation because of the tone and tenor of the election

> cycle. Any additional extension will add to the call volume. Because of the pandemic and related social distancing requirements, adding still more staff is not a viable option at this time.
>
> Finally, based on my experience in election administration, a subset of voters will always miss whatever deadline is set. For this subset of voters, no extension of time will help. The extension already provided was adequate as detailed in the FSE's letter to the Secretary of State.

ECF 23-4.

During the extension the State already provided, approximately 50,000 Floridians submitted material using the online voter registration website; 70,099 Floridians did so on October 5, 2020. ECF 23-5. These numbers are consistent with the numbers before the 2018 general election, where 25,176 and 60,624 submissions came through the website in the final two days respectively. ECF 23-5. To suggest that the State's extension was inadequate—without any contrary evidence—is thus empty rhetoric.

*Florida Democratic Party v. Scott*, 215 F. Supp. 3d. 1250 (N.D. Fla. 2016), does not compel a different outcome. There, "in excess of a hundred thousand aspiring eligible Florida voters were" expected to "register[] to vote in the final *week* of voter registration" when "Hurricane Matthew not only forced many of those voters to evacuate the state, but also foreclosed the only methods of registering to vote: in person or by mail." *Id*. (emphasis added). Here, the online voter registration

site issues affected eligible individuals for several hours—the site was never down as reflected by Mr. Maynor's declaration. *See* ECF 23-5. Other avenues to register also remained open, such as printing, and putting in the mail, a paper application. Critically, in *Florida Democratic Party*, the Court extended the registration deadline for two days to account for the five days that Hurricane Matthew affected voter registration efforts. Here, the Secretary already extended the deadline in excess of the time that the online voter registration website experienced difficulties.

Nor do the two unpublished, out-of-jurisdiction, district court orders to which the Plaintiffs direct the Court's attention help the Plaintiffs. Both addressed election-regulation challenges premised on the COVID-19 pandemic, so neither is relevant. *See, e.g.*, *Democratic Nat'l Comm. v. Bostelmann*, No. 20-CV-249-WMC, 2020 WL 5627186 at *17 (W.D. Wis. Sept. 21, 2020); *Mi Familia Vota v. Hobbs*, No. CV-20-01903-PHX-SPL (D. Ariz. Oct. 5, 2020). What is relevant, however, are the proclamations of both the United States Supreme Court and the Eleventh Circuit that, even during a year posing unprecedented challenges, "lower federal courts should ordinarily not alter the election rules on the eve of an election,'" *New Ga. Project*, 2020 U.S. App. LEXIS 31405, at *11 (quoting *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020)), because "the States" must be allowed "to run their own elections." *Id.* Underscoring this point is the Eleventh Circuit's observation that, "[s]ince March, the Supreme Court has reviewed, by our

count, seven emergency motions related to district court injunctions of state election laws due to COVID-19," and "[i]n six of those cases it has stayed the injunction or declined to vacate a stay issued by the circuit court." *Id*. "[I]n the one case where the Court denied the application for a stay, it did so only because the state officials and the plaintiffs had already agreed to settle the case." *Id*. (citing *Republican Nat'l Comm. v. Common Cause R.I.*, No. 20A28, ---S. Ct. ----, 2020 U.S. LEXIS 3632, 2020 WL 4680151, at *1 (U.S. Aug. 13, 2020)).

*   *   *

The extended online voter registration deadline the Plaintiffs challenge is reasonable, neutral, nondiscriminatory, and critically important for maintaining election integrity in one of the Nation's most populous States during a Presidential election year. And as extended, it accounts for the unfortunate technological difficulties experienced near the statutorily imposed deadline. It therefore survives *Anderson-Burdick* balancing.

### B. THE PLAINTIFFS WILL NOT EXPERIENCE HARM, IRREPARABLE OR OTHERWISE, IF THEIR REQUEST FOR A PRELIMINARY INJUNCTION IS DENIED.

"A showing of irreparable injury is the sine qua non of injunctive relief." *Siegel*, 234 F.3d at 1176 (internal quotation marks omitted). Thus, "even if Plaintiffs establish a likelihood of success on the merits, the absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief

improper." *Id*. As discussed above, the Plaintiffs are manifestly unlikely to succeed on the merits of their challenges. And because they have not made any showing that any voter risks disenfranchisement under the extended registration deadline, they will experience no harm, irreparable or otherwise, if their motion for a preliminary injunction is denied.

### C.   THE PLAINTIFFS' REQUESTED RELIEF WOULD HARM THE STATE FAR WORSE THAN IT WOULD BENEFIT THE PLAINTIFFS.

The Eleventh Circuit has recently made the self-evident point that the State has "a substantial interest in avoiding chaos and uncertainty in its election procedures." *Hand v. Scott*, 888 F.3d 1206, 1214 (11th Cir. 2018). Declarations from election officials underscore that relief in this instance would add to the noise and the workload during this election cycle. "Call it what you will—laches, the *Purcell* principle, or common sense—the idea is that courts will not disrupt imminent elections absent a powerful reason for doing so." *Crookston v. Johnson*, 841 F.3d 396, 398 (6th Cir. 2016) (citing *Purcell v. Gonzalez*, 549 U.S. 1, 5-6 (2006)). Or as the Eleventh Circuit recently said, "lower federal courts should ordinarily not alter the election rules on the eve of an election," an admonition especially applicable when the election has already begun with hundreds of thousands of ballots cast. *New Ga. Project*, 2020 U.S. App. LEXIS 31405, at *11 (quoting *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020)), because "the States" must be allowed "to run their own elections." *Id*.; *see also Diaz v. Cobb*, 541 F.

19

Supp. 2d 1319, 1327 (S.D. Fla. 2008) (noting that the weeks leading up to an election "are the most tumultuous times in a Supervisor's office" and identifying the catalogue of tasks that must be accomplished for a successful election).

As a more general matter, "any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co*., 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers); *accord, e.g*., *Maryland v. King*, 567 U.S. 1301, 1301 (2012) (Roberts, C.J., in chambers); *Hand*, 888 F.3d at 1241. At present, the Plaintiffs collectively ask the Court to rewrite or dispense with several provisions of duly enacted Florida Legislation. Given that the Plaintiffs are largely in control of whether their ballots will be counted in August and November, the balance plainly tilts in favor of leaving intact Florida's election regulations.

### D. THE PLAINTIFFS' REQUESTED RELIEF WOULD PROFOUNDLY HARM THE PUBLIC INTEREST.

Finally, as the Supreme Court has long recognized, "a due regard for the public interest in orderly elections support[s]" a "decision to deny a preliminary injunction." *Benisek v. Lamone*, 138 S. Ct. 1942, 1944-45 (2018). The consistent theme that threads together all of the State's arguments in this filing is this: Florida, like the rest of the Nation, must play its oversized role in selecting the next President of the United States. Judicially overhauling a critical Florida election deadline might

sabotage, perhaps irreparably, Florida's efforts to maintain normalcy during this profoundly abnormal election cycle.

## CONCLUSION

The Plaintiffs bear a heavy burden here. They have not met it. Their request for a preliminary injunction should be denied.

Respectfully Submitted,

/s/ Mohammad O. Jazil
MOHAMMAD O. JAZIL (FBN 72556)
HOPPING GREEN & SAMS, P.A.
119 South Monroe Street, Suite 300
Tallahassee, FL 32301
(850) 222-7500
(850) 224-8551 (fax)
mjazil@hgslaw.com

/s/Bradley R. McVay
BRADLEY R. MCVAY (FBN 79034)
   General Counsel
Florida Department Of State
R.A. Gray Building Suite, 100
500 South Bronough Street
Tallahassee, Florida 32399-0250
Phone: (850) 245-6536
Fax: (850) 245-6127
brad.mcvay@dos.myflorida.com

*Counsel for Secretary Laurel M. Lee*

/s/ James W. Uthmeier
James Uthmeier (FBN 113156)
Deputy General Counsel
Executive Office of the Governor
The Capitol, PL-05
Tallahassee, Florida 32399-0001
(850) 717-9310
James.Uthmeier@eog.myflorida.com

Dated: October 7, 2020                    *Counsel for Governor Ron DeSantis*

## <u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULES</u>

The undersigned certifies that the foregoing complies with the size, font, and formatting requirements of Local Rule 5.1(C), and that the foregoing complies with the word limit specified in Local Rule 7.1(F). Specifically, this brief contains 4,997 words, excluding the case style, signature block, and certificates.

*/s/ Mohammad O. Jazil*
MOHAMMAD O. JAZIL

## **<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that a true and correct copy of the foregoing was served to all counsel of record through the Court's CM/ECF system on this **<u>7th</u>** day of October, 2020.

/s/ Mohammad O. Jazil
MOHAMMAD O. JAZIL