## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**AUGUSTA SANDINO CHRISTIAN
NAMPHY, DREAM DEFENDERS,
NEW FLORIDA MAJORITY,
ORGANIZE FLORIDA, and
FLORIDA IMMIGRANT
COALITION,**

          *Plaintiffs*,

**v.**                             **Case No.:  4:20cv485-MW/MAF**

**RON DESANTIS, in his official
Capacity as Governor of the State
of Florida, and LAUREL M. LEE,
in her official capacity as Florida
Secretary of State,**

          *Defendants*.

_____/

## AMENDED ORDER ON MOTION FOR PRELIMINARY INJUNCTION[1]

Notwithstanding the fact that cinemas across the country remain closed, somehow, I feel like I've seen this movie before. Just shy of a month from election day, with the earliest mail-in ballots beginning to be counted, Florida has done it again. In the final hours of Florida's voter registration period, during an election year coinciding with a prolonged and incredibly damaging public health emergency,

---

[1] This Court issues this Amended Order to remove the section of its original order, ECF No. 35, denying a stay pending appeal. Because this Court denies the motion for preliminary injunction, there is nothing for this Court to stay. This Court will only note that it issued its original order at 2:07 a.m. this morning and the section was inadvertently left in the order during the drafting process.  This Court has also corrected some typographical errors.

Florida's voter registration website crashed, effectively preventing thousands of potential voters from safely registering to vote before the midnight deadline.

With the public sounding the alarm, the Secretary of State decided to implement a half measure. She hastily and briefly extended the registration period and ordered Florida's supervisors of elections to accept applications submitted by the Secretary's new "book closing" deadline.

The Secretary's "cure" had at least one major flaw; namely, she did not notify the public until—at the earliest—after noon on the date of her new "book closing" deadline. This left less than seven hours for potential voters to somehow become aware of the news and ensure that they properly submitted their voter registration applications, all while also participating in their normal workday, school, family, and caregiving responsibilities.

The issue in this case is whether the Secretary's failure to maintain a fully functional voter registration website in the final hours of the voter registration period and the Secretary's limited deadline extension pass constitutional muster.

I

Florida permits individuals to submit voter registration applications online, § 97.0525(1), Florida Statutes, and requires the Division of Elections of the Department of State to "establish a secure Internet website," for the purpose of online voter registration. § 97.0525(2), Fla. Stat. Defendant Lee's office maintains

the state's voter registration website at "RegisterToVoteFlorida.gov," and has described the website as "a secure and convenient online option to register to vote or update a voter registration record." ECF No. 3-8, at 1. "RegisterToVoteFlorida.gov" is purported to be "available 24 hours a day, 7 days a week." *Id.*

Florida's election code fixes the deadline to register to vote on the 29th day before each election. § 97.055(1)(a), Fla. Stat.[2] Accordingly, for the 2020 General Election, Florida's registration deadline was 11:59 p.m. on October 5, 2020. On that date, potential voters seeking to register or update their voter information online ahead of the midnight deadline faced an unexpected obstacle when "RegisterToVoteFlorida.gov" crashed. This malfunction effectively prevented applicants from successfully submitting online voter registration applications for several hours. *See* ECF Nos. 3-2 (describing repeated error messages displayed when attempting to load https://registertovoteflorida.gov over the course of several evening hours on October 5, 2020), 6-1 (detailing messages from several Floridians who were unable to complete the online registration form due to system errors on October 5, 2020), 3-7 (conceding that Floridians encountered "difficulties" when attempting to register to vote online on October 5, 2020). The immediate result of

---

[2] Indeed, Florida sets one of the most restrictive registration deadlines permitted under federal law. *See* 52 U.S.C. § 20507.

this system failure was that, at 12:00 a.m. on October 6, 2020, unsuccessful online applicants became ineligible to vote in the 2020 General Election.

On October 6th, Defendant Lee issued "Directive 2020-02 - Extension of Florida Voter Registration Deadline," which acknowledged the "difficulties" that Floridians experienced with the voter registration website and directed Florida's supervisors of elections to include "any applications received on Florida's Online Voter Registration system today, October 6, 2020, before 7:00 p.m. Eastern Time" in the registration for the 2020 General Election. ECF No. 3-7. Defendant Lee further directed the supervisors of elections to include "[p]aper applications postmarked by . . . October 6, 2020," and in-person applications through specified channels if received before 7:00 p.m. local time on October 6, 2020.[3] Defendant Lee's office then issued a press release around 12:20 p.m. on October 6th stating that she had issued a directive extending the voter registration deadline earlier in the day, and this would permit potential voter registrants to submit online applications until 6:59 p.m. Eastern Time on October 6th. ECF No. 3-6.

---

[3] It is questionable whether Defendant Lee acted contrary to Florida law in ordering Florida's supervisors of elections to accept online voter registration applications, mail-in applications, and in-person applications before this new deadline. This Court reiterates its concerns expressed during the hearing on this motion that the Secretary appears to have done that which she (and the Eleventh Circuit) previously asserted she had no authority to do. *See Jacobson v. Fla. Sec'y of State*, 19-14552, 2020 WL 5289377, *11 (11th Cir. Sept. 3, 2020) (finding that Florida's supervisors of elections are "independent officials not subject to the Secretary's control").

Plaintiffs filed this case on October 6, 2020, seeking emergency injunctive and declaratory relief, alleging the Secretary's malfunctioning online voter registration system and failure to adequately extend the voter registration deadline pose an undue burden on the right to vote in violation of the First and Fourteenth Amendments to the Constitution. Plaintiffs seek a preliminary injunction extending the "book closing" deadline to allow applicants who were otherwise denied the ability to register on October 5th and 6th a meaningful opportunity to submit their voter registration applications and to allow Organizational Plaintiffs a reasonable amount of time to brief their staff and educate potential voters that they have an opportunity to register notwithstanding the Secretary's failures.[4]

Plaintiffs include four organizations ("Organizational Plaintiffs") alleging that their missions include civic engagement activities and voter registration efforts across the state of Florida. Organizational Plaintiffs assert that the Secretary's faulty voter registration website and Defendants' failure to extend the voter registration deadline hinders their efforts, frustrates their missions to register voters, and requires that they divert resources from other activities to essentially do "damage control" to educate potential voters. Plaintiffs claim Defendants' failure to extend the voter registration deadline past 7:00 p.m. on October 6th completely disenfranchises

---

[4] Plaintiffs also requested a temporary restraining order. This Court denied this initial request, finding no immediate and irreparable injury would result before Defendants could be heard in opposition. ECF No. 10.

thousands of Floridians and amounts to a severe burden on the right to vote due to insufficient notice of the deadline extension in conjunction with the brevity of the extension.

## II

Before addressing the merits of the motion for preliminary injunction, this Court must address some threshold questions. The first is whether Defendants are the proper parties before this Court.[5] The second is whether the Organizational Plaintiffs have standing.[6]  The third is whether the Supreme Court's decision in *Purcell* bars consideration of election law during an election cycle.

## A

This Court first addresses whether Defendant DeSantis and Defendant Lee are the proper parties to be sued in this case. It is well-established that while a state may not be sued unless it waives its sovereign immunity or that immunity is abrogated by Congress, *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62 (2000), a suit alleging a constitutional violation against a state official in his or her official capacity for prospective injunctive relief is not a suit against the state and, therefore, does not

---

[5] Ordinarily, this Court addresses standing as a threshold matter before addressing whether the proper parties are before the court. However, because the Governor is not a proper party, the Court addresses this issue out of order.

[6] On October 7, 2020, Plaintiff Namphy entered a notice of voluntary dismissal as to his individual claims. ECF No. 26. This notice is effective without an order. ECF No. 27. Inasmuch as Plaintiff Namphy is no longer a party to this action, this order addresses only the Organizational Plaintiffs' claims.

violate the Eleventh Amendment, *Ex parte Young*, 209 U.S. 123, 161 (1908). That is because "[a] state official is subject to suit in his official capacity when his office imbues him with the responsibility to enforce the law or laws at issue in the suit." *Grizzle v. Kemp*, 634 F.3d 1314, 1319 (11th Cir. 2011). Furthermore, supervisory authority, in and of itself, is insufficient to render state-level Florida authorities' proper defendants. *See generally Jacobson*, 2020 WL 5289377. Instead, a state official needs to have "some connection" with the underlying claim in the lawsuit. *Id.* at *13 ("To be a proper defendant under *Ex parte Young*—and so avoid an Eleventh Amendment bar to suit—a state official need only have 'some connection' with enforcement of challenged law.") (citation omitted).

Defendants do not argue that Defendant Lee is not a proper party. However, for the sake of completeness, this Court will address the issue. Defendant Lee is undoubtedly a proper party to this lawsuit. As discussed in the causation inquiry of the standing section, Defendant Lee has more than a supervisory authority over the website at issue in this case. Indeed, Defendant Lee is required by law to "establish a secure Internet website" for the purpose of online voter registration. § 97.0525(2), Fla. Stat. As such, she has more than "some connection" with the underlying claim in this lawsuit.

But Defendant DeSantis, on the other hand, does not have more than "some connection" with the underlying claim. Plaintiffs imply that Defendant DeSantis, as

Governor, had the authority to extend the voter registration deadline. ECF No. 1, at 6. But it appears that Defendant DeSantis lacked the authority to extend the deadline. Florida law cloaks the Governor with general emergency management powers. § 252.36, Fla. Stat. But courts cannot use tunnel vision when construing statutes; rather, statutes must be considered as a whole. *John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank*, 510 U.S. 86, 94 (1993). And in the event of an emergency or disaster, the Governor is authorized "to suspend or delay any election." § 101.733, Fla. Stat. That does not imply the Governor is authorized to extend the voter registration. In fact, it implies the opposite. *See O'Melveny & Myers v. F.D.I.C.*, 512 U.S. 79, 86 (1994) (referencing the canon "*Inclusio unius, exclusion alterius*"). Furthermore, specific statutes prevail over general ones. *D. Ginsberg & Sons v. Popkin*, 285 U.S. 204, 208 (1932). Thus, because Defendant DeSantis's office did not "connect[] him with the duty of enforc[ing]" a voter registration extension, *Ex parte Young*, 209 U.S. at 161, he does not appear to be a proper party here.

B

Standing is a threshold matter this Court must determine before proceeding to consider the merits of Organizational Plaintiffs' claims. *E.g.*, *Via Mat Int'l S. Am. Ltd. v. United States*, 446 F.3d 1258, 1262 (11th Cir. 2006). To establish standing, a plaintiff must prove he has suffered (1) an injury in fact that (2) is fairly traceable to

the challenged action of the defendant and (3) is likely to be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).

This Court first addresses whether Organizational Plaintiffs have established an injury in fact. In certain scenarios, an organization has standing to assert claims based on injuries to itself if that organization is affected in a tangible way.[7] As my colleague has held before, "[a]n organization has standing to challenge conduct that impedes its ability to attract members, to raise revenues, or to fulfill its purposes." *Florida Democratic Party v. Hood*, 342 F. Supp. 2d 1073, 1079 (N.D. Fla. 2004) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)).

In *Havens*, the Supreme Court held that HOME, a nonprofit organization, had standing to pursue claims under the Fair Housing Act based on an asserted injury to the organization itself. HOME's stated purpose "was 'to make equal opportunity in housing a reality in the Richmond Metropolitan Area,' " and its activities included operating a housing counseling service and investigating and referring complaints concerning housing discrimination. *Id.* at 368. HOME's claimed injury was that the respondent's challenged acts "frustrated . . . [HOME's] efforts to assist equal access to housing through counseling and other referral services." *Id.* at 379. HOME further

---

[7] To the extent Defendant Lee asserts Organizational Plaintiffs' only available theories for standing are associational, see Footnote 8. The cases cited in Footnote 8 suggest widespread Circuit Court agreement, including in the Eleventh Circuit, that organizations can themselves suffer injuries regardless of whether their members have standing.

alleged it "had to devote significant resources to identify and counteract the defendant's [illegal practices]." *Id.*

According to the Supreme Court, HOME's allegations more than sufficed to establish the organization's standing. *Id.* ("If, as broadly alleged, petitioners' steering practices have perceptibly impaired HOME's ability to provide counseling and referral services for low- and moderate-income homeseekers, there can be no question that the organization has suffered injury in fact."). HOME established both a "concrete and demonstrable injury to the organization's activities," and that it suffered a "consequent drain on [its] resources," constituting "far more than simply a setback to the organization's abstract social interests." *Id.* (citing *Sierra Club v. Morton*, 405 U.S. 739 (1972)).

Here, Organizational Plaintiffs have similarly established a concrete injury to their organizational activities and a consequent diversion of resources. Each provided testimony that they are a nonprofit organization with offices in Florida, ECF Nos. 26-2, at 1; 26-3, at 1; 26-6, at 1; 3-5, at 1, whose activities or missions include participating in civic engagement, voter outreach, and registering Florida voters. ECF Nos. 26-2, at 1 (Plaintiff Dream Defenders "conducts voter registration and voter engagement work throughout the State of Florida."), 3-3, at 2 (Plaintiff New Florida Majority, Inc. "work[s] with . . . individual members and civic engagement organizations to assist underserved communities throughout Florida in

voter registration, voter education, and get-out-the-vote efforts."), 26-6, at 1 (Plaintiff "Organize Florida normally hosts a large-scale voter registration program throughout the State of Florida."), 3-5, at 1 ("Since 2019," Plaintiff Florida Immigrant Coalition has spent "nearly two million dollars . . . [on] registering new voters").

Each provided testimony that due to the COVID-19 pandemic, they have reoriented their voter registration activities to online formats. ECF Nos. 26-2, at 1; 26-6, at 1; 3-5, at 1; 3-3, at 2. In doing so, they have come to heavily rely on the Secretary's voter registration website to assist potential voters in submitting registration applications. *See, e.g.*, ECF No. 3-5, at 1 (Plaintiff Florida Immigrant Coalition "ha[s] been primarily dependent on the state's online voter registration website (OVR) to register new voters since the spring of 2020.").

Like the organization in *Havens*, each Organizational Plaintiff here provided evidence that the actions at issue frustrated their organizational missions. More specifically, Organizational Plaintiffs assert the Secretary's failure to maintain a working voter registration website on the evening of October 5, 2020, and the Secretary's actions on October 6, 2020—providing allegedly inadequate notice of a brief deadline extension—has effectively frustrated their efforts to register Florida voters. Organizational Plaintiffs further assert these failures necessitated the diversion of resources from their voter registration and get-out-the-vote efforts to

both troubleshooting the website crash to the extent it was possible, and to scrambling to assemble voter registration education and assistance during the Secretary's brief extension on October 6th. ECF Nos. 3-5, at 2 (Florida Immigrant Coalition's affidavit of Maria Rodriguez describing disruption of planned phone bank events and diversion of staff time to troubleshoot the website crash), 26-2, at 2 (Plaintiff Dream Defenders' affidavit of Nailah Summers describing disruption of planned phone bank events, diversion of staff time, and efforts on October 6, 2020, to reach voters, coordinate with other organizations, and manage a "rapidly evolving situation"), 26-3, at 1 (Plaintiff New Florida Majority Education Fund's affidavit of Teresa Pagan describing disruption of follow-up activities due to October 5th crash, diversion of resources from follow-up activities to troubleshoot the website crash and contacting local and national partners and election officials, and efforts to get canvassing effort up and running on October 6th after being "caught off guard" by the state's deadline extension), 26-6, at 2 (Plaintiff Organize Florida's affidavit of Stephanie Porta describing diversion of resources from staffing vote-by-mail work to notification regarding the October 6th deadline extension and added cost of $1,900 to pay canvassers for extra work hours).

Clearly, the website crash and next-day scramble to organize and effectively reach out to potential voters frustrated each organization's mission to register voters. Based on the above-cited affidavits, Organizational Plaintiffs have established a

concrete injury to their organizations' activities—the frustration of their organizational missions to register voters and the consequent diversion of resources from their pre-planned operations to essentially conducting damage control in voter outreach, assistance, and online registration on October 5th and 6th.[8]

The next issue is whether the Organizational Plaintiffs' injury is fairly traceable to the challenged acts, including (1) the failure to maintain a functional voter registration website, and (2) the brief extension of the "book closing" deadline to October 6, 2020, at 7:00 p.m. Eastern Time. The frustration of the Organizational Plaintiffs' missions to register voters and the diversion of the organizations' resources are fairly traceable to the challenged acts. Defendant Lee's Division of Elections is required by law to "establish a secure Internet website," for the purpose of online voter registration. § 97.0525(2), Fla. Stat. But Defendant Lee failed to

---

[8] Several courts have reached the same conclusion in similar assessments. *See Common Cause Ind. v. Lawson*, 937 F. 3d 944, 952-53 (7th Cir. 2019) ("Our sister circuits have upheld the standing of voter-advocacy organizations that challenged election laws based on similar drains on their resources. Like us, they have found that the organizations demonstrated the necessary injury in fact in the form of unwanted demands on their resources.") (citing cases from the Fifth, Sixth, Ninth, and Eleventh Circuits). *See also OCA-Greater Houston v. Texas*, 867 F. 3d 604, 612 (5th Cir. 2017) (upholding organizational standing for non-profit based on injury—albeit "not large" one—resulting from extra time spent educating voters about a new voting law instead of organization's normal "get out the vote" activities with membership); *Nat'l Council of La Raza v. Cegavske*, 800 F. 3d 1032, 1040-41 (9th Cir. 2015) ("Resources Plaintiffs put toward registering someone who would likely have been registered by the State had it complied with the NVRA, are resources they would have spent on some other aspect of their organizational purpose—such as registering voters the NVRA's provisions do not reach, increasing their voter education efforts, or any other activity that advances their goals. Contrary to the district judge's view, Plaintiffs have not alleged that they are simply going about their 'business as usual,' unaffected by the State's conduct.").

provide this website over the course of several hours on the original "book closing" deadline, preventing untold numbers of potential voters from submitting their online applications. Moreover, Defendant Lee unilaterally extended the "book closing" deadline, but in doing so, provided little notice of the extension in the middle of a work day with less than 7 hours remaining before the new deadline.[9] If not for these actions on the part of Defendant Lee, Organizational Plaintiffs would not have had to divert their resources to investigate the website crash or conduct additional outreach and voter registration assistance in lieu of other pre-planned activities, including commencing get-out-the-vote outreach on October 6th.

Finally, Plaintiffs have shown that Defendant Lee has the power to redress the above-described injuries, and that this Court can fashion an injunction that would redress the same injuries; namely, a court order extending the "book closing" deadline *with adequate notice*, as this provides Organizational Plaintiffs a fair opportunity to contact registrants who were denied the chance to register on October 5th and 6th through no fault of their own.[10] Moreover, the Secretary clearly can

---

[9] For purposes of this Court's standing analysis, this case is distinguishable from *Jacobson*, because the alleged organizational injuries are directly traceable to the Secretary's actions.

[10] Again, *Jacobson*, is distinguishable from this case. While the Secretary may not have the authority to issue an enforceable order to Florida's supervisors of elections if they fail to perform their duties, the Secretary took it upon herself to change the "book closing" deadline. The duties of Florida's supervisors of elections remain unchanged in this case, regardless of when this "book closing" deadline occurs. *See* § 97.053(7), Florida Statutes ("All voter registration applications received by a voter registration official shall be entered into the statewide voter

redress Plaintiffs' injuries as she is responsible for maintaining the voter registration website, and has already extended the "book closing" deadline. Accordingly, the Organizational Plaintiffs have standing to assert their claims.

## C

Finally, with respect to threshold matters, it has been suggested to this Court that recent election-related cases from the Supreme Court dictate that *Purcell* bars consideration of election law during an election cycle. It is true, as the Eleventh Circuit has aptly pointed out, that there has been a trend in recent Supreme Court decisions that suggests that district courts should allow "the States to run their own elections." *New Ga. Project v. Raffensperger*, No. 20-13360-D, 2020 WL 5877588, at *3 (11th Cir. Oct. 2, 2020). However, this Court is unaware of any judicial canon suggesting that a trend or a "mantra" creates a precedent or a legal principal, or *sub silentio* overturns a binding precedent. Instead, a well-known principal is that each case is unique. The facts that transpired in cases where the Supreme Court stayed the district court's orders are separate and apart from the facts that transpired in this case. Merely because the recent trend in cases from the Supreme Court suggests that the lower courts should allow "the States to run their own elections" does not absolve this Court of analyzing the particular facts surrounding the case in front of it. In plain

registration system within 13 days after receipt. Once entered, the application shall be immediately forwarded to the appropriate supervisor of elections.").

words, this Court gives no weight to the recent trend in election related cases; instead, it focuses on the particular facts of this case in light of *Purcell*.

At the outset, it bears noting that *Purcell* did not create a per se rule prohibiting against enjoining unconstitutional voting laws or procedures on the eve of the election. That is to say, *"Purcell* is not a magic wand that defendants can wave to make any unconstitutional election restriction disappear so long as an impending election exists." *People First of Ala. v. Sec'y of State for Ala.*, 815 F. App'x 505, 514 (11th Cir. 2020) (Rosenbaum, J. & Pryor, J., concurring); *see also Veasey v. Perry*, — U.S. — , 135 S. Ct. 9, 10 (2014) (Ginsburg, J., dissenting) (*"Purcell* held only that courts must take careful account of considerations specific to election cases, not that election cases are exempt from traditional stay standards."). Rather, *Purcell* requires this Court to take into account critical considerations such as voter confusion that may result from a judicial order. *Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006) ("Court orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls."). "As an election draws closer," the risk of voter confusion will increase. *Id.* at 5. Therefore, as an election draws closer, the concerns highlighted by the Court in *Purcell* only get weightier.

This Court is aware that the election is less than a month away. As such, this Court gives great weight to the concerns highlighted in *Purcell*. In analyzing the

injunction factors and applying the *Anderson-Burdick* balancing test, this Court keeps in mind the Supreme Court's admonition articulated in *Purcell*.

## III

Under Rule 65 of the Federal Rules of Civil Procedure, a district court may grant a preliminary injunction "only if the moving party shows that: (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc). Although a "preliminary injunction is an extraordinary and drastic remedy," it nonetheless should be granted if "the movant 'clearly carries the burden of persuasion' as to the four prerequisites." *United States v. Jefferson Cty.*, 720 F.2d 1511, 1519 (11th Cir. 1983) (quoting *Canal Auth. v. Callaway*, 489 F.2d 567, 573 (11th Cir. 1974)). None of these elements, however, is controlling; rather, this Court must consider the elements jointly, and a strong showing of one element may compensate for a weaker showing of another. *See Fla. Med. Ass'n, Inc. v. U.S. Dep't of Health, Educ., & Welfare*, 601 F.2d 199, 203 n.2 (5th Cir. 1979).

A

This Court will first address whether Plaintiffs have shown a likelihood of success on the merits. To address this factor, this Court must apply the familiar *Anderson-Burdick* framework. *See Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1318 (11th Cir. 2019).

As a threshold matter, states retain the power to regulate their own elections. *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (citation omitted). And this power includes the right to create laws that will impose some burden on the right to vote. *Id.* But the right to vote is precious and foundational for every other right. *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). When a court is faced with a challenge to an election law, the court must first determine what standard applies. For example, rational basis review applies when a plaintiff alleges only that a state treated him or her differently than similarly situated voters without a corresponding burden on the fundamental right to vote. *Obama for Am. v. Husted*, 697 F.3d 423, 429 (6th Cir. 2012) (citing *McDonald v. Bd. of Election Comm'rs*, 394 U.S. 802, 807-09 (1969)). On the other hand, strict scrutiny applies when a state severely burdens the fundamental right to vote. *Id.* (citing *Burdick*, 504 U.S. at 428). Examples of laws triggering strict scrutiny include laws that impose a poll tax, a property ownership requirement, or a law that violates the "one person one vote" principal. *Lemons v. Bradbury*, 538 F.3d 1098, 1103-04 (9th Cir. 2008).

18

Most cases involving election laws, however, fall in between these two standards. Because this is such a case, the more flexible *Anderson-Burdick* standard applies. Under *Anderson-Burdick*, a court considering a challenge to a state election law "must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.' " *Burdick*, 504 U.S. at 434 (citing *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)). Under this standard, "[t]he more a challenged law burdens the right to vote, the stricter the scrutiny" that this Court must apply. *See Lee*, 915 F.3d at 1318. When an election law imposes only reasonable, nondiscriminatory restrictions upon the constitutional rights of voters, the state's important regulatory interests are generally sufficient to justify the restrictions. *Burdick*, 504 U.S. at 434. But, "[h]owever slight the burden may appear . . . it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitations." *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1352 (11th Cir. 2009). This is not a litmus test; rather, the court must balance these factors and make hard judgments. *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 190 (2008). Finally, "*Anderson/Burdick* balancing . . . should not be divorced from reality, and [] both the burden and legitimate regulatory interest should be evaluated

in context." *Obama for Am.*, 697 F.3d at 441 (White, J., concurring); *see also Swanson v. Worley*, 490 F.3d 894, 909 (11th Cir. 2007). Having identified the applicable standard, this Court now turns to its application, which consists of three steps—identifying the injury, identifying the state's justifications, and weighing the two against each other. *See Lee*, 915 F.3d 1312, 1319-26.

*First*, this Court identifies the asserted injury. Here, the injury is layered. Organizational Plaintiffs' injury is inextricably intertwined with the injury potential voters suffered as a result of the website crash and limited "book closing" extension. This is because Organizational Plaintiffs' stated missions include registering Florida voters. This aspect of their mission was thwarted on October 5th and 6th when the Secretary's website malfunctioned, in effect limiting their ability to register voters online and diverting their resources from other activities. Accordingly, this Court applies the *Anderson-Burdick* balancing test to Plaintiffs' claims because their injury flows directly from potential voters' injury.

The injury to potential voters is twofold. One, because Florida's online registration system failed, potential voters—through no fault of their own—could not submit online voter registration applications before the October 5, 2020 deadline. Two, the public was not notified of Defendant Lee's Directive 2020-02 until after 12:00 p.m. Eastern Time on the same day as the 7:00 p.m. Eastern Time deadline. So, some potential voters could not take advantage of Defendant Lee's October 6th

extension, not only because they lacked notice, but also because the extension was largely limited to working hours. *See* ECF Nos. 26-1, 26-4, 26-8. Still, the burden here is not a total deprivation of the right to vote, but a limitation on the period in which potential voters can register. Indeed, during the time the website was down, Floridians could still register through other avenues—including in person and by mail.[11]

This case would be much different if the question before this Court solely dealt with the October 5th crash; if Defendant Lee had not extended the deadline, granting a preliminary injunction would give this Court little pause. But that is not what happened. Defendant Lee did extend the deadline by several hours. ECF No. 22-7. Plus, Defendant Lee directed Florida's supervisors of elections to accept paper applications postmarked by October 6th, as well as in person applications completed before 7:00 p.m. *Id.* The burden on the right to vote was unquestionably mitigated by the directive. Indeed, according to Scott Maynor, the Deputy Chief Information Officer overseeing the online voter registration system, approximately 50,000 Floridians were able to submit online applications during the extension. ECF No. 23-5, at 3.[12]

---

[11] Nonetheless, this Court is still troubled by the limited nature of these mitigating factors based on the fact that the website shut down close to and after normal working hours, and one would not expect post offices or local elections offices to be open late.

[12] This Court requested Defendant Lee to provide an hourly breakdown of online voter registration numbers; however, Defendant Lee belatedly filed the requested information after the

The question, taking Defendant Lee's extension into account, is whether Floridians were in fact barred from registering, and therefore disenfranchised. The only evidence this Court has before it to consider the impact these burdens had on voter registration numbers is barebones data comparing historic voter registration numbers between 2018 and 2020. *Id.* According to this limited record, 140.8% more people registered to vote on the final registration day in 2018 than the day before. *See id.* All things being equal, one would expect to see roughly similar increases in voter registration numbers between the last two days of registration in 2020. But, according to Defendant Lee's data, there was only a 103.92% increase from October 4th to October 5th and 6th. *See id.* Clearly, the website crash had some effect on voter registration.

Moreover, if the data had shown a 140.8% increase, like in 2018, from October 4th to October 5th and 6th, then the number of individuals who would have registered to vote would have been 141,821. The actual number of registrants, however, was 120,099. *See id.* With only a barebones record to compare historic figures, and assuming Florida would have seen roughly proportional registration

---

Court again requested it during the hearing. This filing has since been stricken, and this Court is not considering it for purposes of this Court's order. But, nonetheless, this Court would like to point out that the belatedly filed data apparently compares apples to oranges with respect to the historic registration patterns. For 2020, Defendant Lee appears to provide hourly registration numbers from September 30th to October 6th. Inexplicably, for 2018, Defendant Lee appears to provide hourly registration numbers from July 25th to August 1st, roughly two months before the relevant deadline.

numbers between 2018 and 2020, this Court is able to determine that roughly 21,722 Floridians were potentially foreclosed from registering—even with the extension.

By pointing this number out, this Court in no way finds that 21,722 Floridians were actually disenfranchised. This Court, like any factfinder, relies on the record evidence before it, makes reasonable inferences from the record, and does not check its common sense at the door.   And common sense dictates, and the parties' declarations suggest, that a significant number of potential voters were barred from registering even with the extension.[13]

In sum, that potentially thousands of Floridians may not have been able to register because of the state's voter registration website's malfunction is certainly a substantial burden limiting the right to vote. Indeed, "[n]o right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry*, 376 U.S. at 1. Still, this Court finds that the burden here is not so great that it implicates the highest level of scrutiny. Instead, because the burden on the right to vote is high, this Court will evaluate Defendant's justifications under heightened scrutiny.

---

[13] Without citing any data, Supervisor Lux suggests that there are always a few lollygaggers who will miss any deadline. However, the fact that 50,000 individuals registered to vote on the day the extension was granted belies Supervisor Lux's declaration and emphasizes the impact that the State's failure in maintaining a functional website had on Floridians' ability to register.

*Second*, having identified the asserted injury, this Court turns to the precise interest put forward by Defendant Lee; namely, conducting an efficient and orderly election. ECF No. 24, at 14. Specifically, Defendant Lee directs this Court to three affidavits: (1) of Maria Matthews, the Director of the Division of Elections; (2) of Mark Early, the Leon County Supervisor of Elections; and (3) of Paul Lux, the Okaloosa County Supervisor of Elections, ECF Nos. 23-1, 23-3 and 23-4.

Ms. Matthews explained that a surge of voter registrations after any extended registration date could create a situation in which many voters might show up to vote, but not yet be on the voter rolls. ECF No. 21-3, at 3-4. In such a situation, the voter must caste a provisional ballot, slowing the processing of voters of the polling place. *Id.* Further, as Matthews, Early, and Lux all state, the consequences of extending the deadline will reverberate across the entire elections process—forcing supervisors to divert resources to answering calls and processing new registrations— thereby hampering other important tasks, such as processing vote-by-mail requests and ballots, and administering early voting. *Id.* at 4; ECF No. 23-3, at 3-4; ECF No. 23-4, at 3-4. These are indeed weighty concerns. *See Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 364 (1997) (states have a legitimate interest "in protecting the integrity, fairness, and efficiency of their ballots and election process as means for electing public officials"); *see also New Ga. Project*, 2020 WL 5877588, at *3 (explaining that interests justifying election deadlines include "conducting an

efficient election, maintaining order, [and] quickly certifying election results"). Finally, this Court recognizes that context matters. *See Obama for Am.*, 697 F.3d at 441 (White, J., concurring). Here, as Supervisor Early recognized, there is already great uncertainty around this election. ECF No. 23-3, at 3. This uncertainty is compounded by an unprecedented pandemic; one that has upended every aspect of American life. Thus, this Court finds that Defendant's proffered justifications are entitled to great weight.

*Third*, having identified the burden on the right to vote and the state's justifications, this Court must weigh them against each other. *Lee*, 915 F. 3d at 1325. This is no easy task. On the one hand, the burden on the right to vote is great; on the other, Defendant Lee has identified weighty justifications for refusing to reopen to registration window. Further, the burden on the right to vote is unquestionably lessened by Defendant Lee's extension, and the unique circumstances of this election militate against placing additional burdens on those tasked with ensuring it is conducted in as safe and orderly a manner as possible.

This is an incredibly close call, but Florida's interest in preventing chaos in its already precarious—and perennially chaotic—election outweighs the substantial burden imposed on the right to vote. In so holding, this Court notes that it is limited to the evidence before it, and Plaintiffs, who bear the burden of persuasion, have not persuaded this Court with record evidence suggesting their requested relief

outweighs the burdens the state faces should this Court order such relief. Nor have the Plaintiffs persuaded this Court that their requested relief would not, in fact, interject an intolerable level of uncertainty into the election. *See Qualls v. Rumsfeld*, 357 F. Supp. 2d 274, 281 (D.D.C. 2005) ("When moving the court for a preliminary injunction, plaintiffs bear the burdens of production and persuasion."). For example, in other voting cases where this Court has granted preliminary injunctions, the plaintiffs offered testimony dispelling concerns that the burden on the state was too great or the remedy unfeasible. *See, e.g., League of Women Voters of Fla., Inc., v. Detzner*, 314 F. Supp. 3d 1205, 1220 (N.D. Fla. 2018).

This is in contrast to the affidavits Defendant Lee offers, and summarized above, which paint a disturbing picture of overworked elections staff, incomplete voter rolls, and election day mayhem. This Court takes cases as they come, and based on the record before this Court, protecting the integrity of Florida's elections outweighs the burden placed on the voting rights of Floridians.

B

The remaining preliminary injunction factors are thoroughly intertwined with considerations already discussed regarding the merits of this claim. On balance, these factors weigh in favor of denying the motion for preliminary injunction. To be clear, though, this Court in no way means to discount the grave burden the state has placed on aspiring voters and the injuries Defendant Lee's actions have caused

26

Organizational Plaintiffs. Indeed, this Court finds that Organizational Plaintiffs have established irreparable injury. Here, potentially thousands of voters have been deprived of the right to cast their ballot because the state of Florida is unable to run a functional voter registration website during the crucial final hours of the registration period.

Be that as it may, as noted above in applying *Anderson-Burdick*, it's clear here that the threatened injury to Organizational Plaintiffs does not outweigh the damage the proposed injunction may cause the state. In making this finding, this Court reiterates that this is an incredibly close call, but—based on the record before this Court—the Court is persuaded that the state's interest in preventing chaos in its already precarious—and perennially chaotic—election outweighs the substantial burden imposed on the right to vote. Similarly, this Court is not persuaded that an injunction, at this juncture, would not be adverse to the public interest. This Court is mindful of the potential for voter confusion that could result from such an order now. More importantly, though, this Court has before it almost no record evidence to persuade it that exasperating the already extraordinary burdens the state's supervisors of elections face in the midst of a pandemic is in the public interest.

## IV

In the end, this case is not about Floridians missing registration deadlines. This case is also not a challenge to a state statute. This case is about how a state

failed its citizens. In this case, potential voters attempted to perform their civic duty, to exercise their fundamental right, only to be thwarted, once again, by a state that seemingly is never prepared for an election. This case is about failure on the part of a civil servant, whose responsibility is to run an election system, that will cost thousands of potential voters their fundamental right to vote in the upcoming election.

These potential voters include a public-school teacher, ECF No. 26-1, a past felon who jumped through hoops to be eligible to vote, ECF Nos. 26-4 and 26-5, a survivor of domestic violence, ECF No. 26-8, and countless others whose stories are not before this Court. To these potential voters, the state's answer for its own failures can only be characterized as "too bad, so sad." The state could have extended the registration deadline until midnight on October 6th, which would have given these potential voters a fighting chance. Instead, the state chose to notify the public during a normal workday and gave them only seven hours to somehow become apprised of their rights and register, all while also participating in their normal workday, school, family, and caregiving responsibilities. One would expect the state to make it easier for its citizens to vote.

Unfortunately for these potential voters, this Court cannot remedy what the state broke under these circumstances. This Court must consider the consequences

of extending the voter registration deadline. Having done so, the motion for preliminary injunction, ECF No. 3, is **DENIED**.

In so ruling, this Court notes that every man who has stepped foot on the Moon launched from the Kennedy Space Center, in Florida. Yet, Florida has failed to figure out how to run an election properly—a task simpler than rocket science.

**SO ORDERED on October 9, 2020.**

<u>s/Mark E. Walker</u>
**Chief United States District Judge**